```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   NEPAMUCENO GALVAN,

 4                    Plaintiff,

 5       v.                                    23 CV 6724(CS)(VR)

 6                                             STATUS CONFERENCE
     ROLLING LAWNS, INC., DAVID FERRARO
 7   AND EVAN FERRARO,

 8                    Defendants.

 9   ------------------------------------x

10                                        United States Courthouse
                                          White Plains, New York
11                                        August 14, 2024

12
     B e f o r e:  THE HONORABLE VICTORIA REZNIK,
13                              United States Magistrate Judge

14

15   KALMANSON COHEN, PLLC
             Attorneys for Plaintiff
16           One Liberty Plaza, 165 Broadway
             New York, New York 10006
17   KIMBERLY KALMANSON
     RANDI COHEN
18   JONI KLETTER

19

20   MOSER LAW FIRM PC
             Attorney for Defendants
21           133 C New York Avenue
             Huntington, New York 11743
22   STEVEN MOSER

23

24

25       ** Transcribed from digitally recorded proceedings **

             Angela O'Donnell - Official Court Reporter
                           (914)390-4025
```

1          THE COURT:  Good morning, everyone.  This is the

2     Galvan case.

3          Will counsel introduce themselves, starting with the

4     plaintiff.

5          MS. KALMANSON:  Good morning, your Honor.

6          Kim Kalmanson, Randi Cohen, and Joni Kletter, from

7     Kalmanson Cohen for the plaintiff.

8          MR. MOSER:  And Steven Moser for the defendants.

9          THE COURT:  All right.  So we have a number of

10    disputes the parties have raised in their letters and their

11    pending motion to quash, but before we start trying to tick

12    through those, I wanted to start by having Ms. Kalmanson or

13    whoever plans to speak on behalf of the plaintiff to give me a

14    brief overview of what this case is about and where things

15    currently stand in discovery in light of the pending disputes.

16         MS. KALMANSON:  Yes, your Honor.  This is Kim

17    Kalmanson.

18         So this is a case of age and disability

19    discrimination.  We allege that the plaintiff, Nepamuceno

20    Galvan, worked for a landscaping company for approximately 30

21    years.  Throughout that period of time he was promoted, and

22    then subsequently, when the owner's son came in, he was demoted

23    back to the basic role that he had been doing prior, and at

24    that time there was a failure to pay overtime, which we allege

25    in the complaint, for a period of, I forget if it was three

1    years or more.  And he, at that time, we allege, began to be

2    discriminated against on the basis of his age.  There are

3    several comments that we reference in the complaint that were

4    made to him and ultimately he was terminated on account of his

5    age and disability.

6          He, in a conversation, this is all alleged in the

7    complaint again, in a conversation with the owner, the owner

8    basically told him there's nothing wrong with his performance

9    but they need new, younger blood in the company and he was

10   terminated.  So we allege that his termination was unlawful on

11   the basis of age discrimination.

12         There's also a disability claim.  We allege that he

13   was injured at work.  He injured his ankle and he was informed

14   by his employer that he shouldn't seek workers' compensation.

15   He was asked to return to work before he was ready to return to

16   work.  There was no accommodation process granted to him and

17   his termination followed that as well.  In terms of

18   discovery --

19         THE COURT:  Okay.

20         MS. KALMANSON:  In terms of discovery, we served --

21   both sides served document requests and interrogatories.  The

22   parties produced sets of documents and interrogatory responses

23   in early July.  Plaintiff was immediately met with two

24   deficiency notices from defendants.  Several days later we

25   responded to those deficiency notices.  We did acknowledge that

1    we made an error in our interrogatories.  We were under the

2    misinterpretation -- misimpression that Rule 33.3 applied.  It

3    did not.  So we supplemented and corrected the interrogatories

4    on that basis within days.

5              We served an additional HIPAA form as well at that

6    time.

7              We have served certain third-party subpoenas, of

8    which the Court is aware and made reference to.

9              There was then a motion to stay service of the

10   subpoenas by defendants and the motions to compel followed.

11             We have tried to meet and confer with defendants.  We

12   also served defendants with our own deficiency notice.

13   Defendants have not produced any ESI.  We're not sure if they

14   have done any searches for ESI.  Our client is aware that the

15   parties -- that the individuals on defendants' side texted

16   regularly and so we believe that there should be ESI.  We have

17   asked counsel for defendants to get more information about

18   that.  We have been trying to work in good faith to resolve the

19   issues.  Defendants' counsel promised information on that a

20   couple of times.  No information has been forthcoming to date.

21             It's our hope that we can continue to work amicably

22   to resolve disputes, but we keep being pounded with new motions

23   and deficiency notices, and we're not really getting any help

24   from the other side in terms of information about their own

25   discovery.

1              THE COURT:  Okay.  Can you remind me, at the moment,

2    what is your contact discovery deadline?

3              MS. KALMANSON:  I believe it's in October.

4              Joni, do you know the discovery deadline?

5              MS. KLETTER:  Yeah, it's the end of October.

6              THE COURT:  Okay.  And are you in a position to take

7    any depositions yet or are you still just working through these

8    document issues?

9              MS. KALMANSON:  So defendants have noticed

10   plaintiff's deposition for Friday.  We have noticed defendants'

11   deposition for early September and the nonparty depositions for

12   the next couple of weeks.  It's our -- it's our intent, and

13   we've expressed this to defendants' counsel, that we push off

14   all depositions, because we're waiting for discovery from

15   defendants.  We don't know the status of that yet and there are

16   two motions to compel our documents pending.  So we'd like to

17   complete document discovery so witnesses don't have to be

18   produced more than once.

19             THE COURT:  Okay.  And how many depositions do you

20   think are likely in this case?  Have you thought through that

21   yet?

22             MS. KALMANSON:  So we have noticed two of defendants.

23   It was two, right, Joni?

24             MS. KLETTER:  Correct.

25             MS. KALMANSON:  We've noticed two plaintiffs --

1    defendants have noticed one deposition and we have subpoenaed,

2    it was six, one is deceased and one has not actually been

3    served, so four nonparties.  We sought documents and

4    depositions and we are hopeful that we can waive some of the

5    depositions if there are documents but we just don't know that

6    at this point yet.

7            THE COURT:  Those four nonparties are separate from

8    the ones that are the subject of the motion to quash?

9            MS. KALMANSON:  No.  Those are the same.

10            THE COURT:  Okay.  So those four nonparty -- those

11    subpoenas have already been served; is that what you're saying?

12            MS. KALMANSON:  They have already been served but we

13    are -- we intend to adjourn the depositions.  We have not done

14    it yet.  We intend to adjourn the depositions until a mutually

15    agreeable date for the parties and counsel for the defendants,

16    and it is our preference to do all document discovery before we

17    take any depositions.

18            THE COURT:  Okay.  Those nonparties that you're

19    awaiting documents and potential depositions for are the

20    customers of the defendant; is that right?

21            MS. KALMANSON:  That's right, your Honor.

22            THE COURT:  Okay.  And so are there any other

23    witnesses like (indiscernible) former employees of the

24    defendant who are on the list of deponents or is that not on

25    the list?

1          MS. KALMANSON:  At this point we haven't noticed

2     anyone else.  We don't have a full set of documents, so we are

3     trying to decide if there are other witnesses that we would

4     need to depose, but we can't really make that determination

5     without a full record.

6          THE COURT:  Okay.  When you gave me the deadline for

7     document discovery, that was the end of October; is that right?

8          MS. KALMANSON:  I believe that's right, your Honor.

9          MS. KLETTER:  Yeah.

10          THE COURT:  Okay.  And then you have a separate

11     deadline that Judge Seibel entered for expert discovery; is

12     that right?

13          MS. KLETTER:  I think that's right.  I can pull up

14     case management order.

15          THE COURT:  All right.

16          So then let me turn to Mr. Moser (indiscernible) will

17     disagree with the underlying facts, but do you have an update

18     from your perspective on discovery and what else is necessary

19     (indiscernible) the disputes that we're talking about?

20          MR. MOSER:  Sure.  Thank you, your Honor.

21          So just briefly, this is a family-owned business.

22     The complaint alleges millions of dollars worth of damages and

23     the plaintiff is seeking $700,000 in overtime and liquidated

24     damages, as well as other damages, which bring the total to

25     close to $2 million.

1           We do not believe that the plaintiff has responded to

2     the interrogatories or the document requests in a manner that's

3     consistent with the federal rules.  We've ask them to withdraw

4     improper objections, to withdraw the privilege objections, and

5     we did that approximately a month and a half ago, or a month

6     and a week ago, and plaintiff has simply declined to do that.

7           We asked for certain authorizations.  We asked for

8     tax returns and other information which were also declined.

9           With regard to the scope of witness discovery, the

10    plaintiffs identified -- the plaintiff identified five current

11    and former employees of Rolling Lawns.  We intend on deposing

12    at least the former employees and perhaps the current

13    employees, as well, although we haven't made the decision as to

14    that.

15          And otherwise, with regard to party discovery and

16    party depositions, we're okay with adjourning the depositions

17    until -- until we can close the page on paper discovery, as

18    well as adjourning the nonparty depositions in an attempt to

19    see if they can be resolved by document production or to hold

20    off until we have a more full paper discovery.

21          THE COURT:  Okay.  Well, so at least you all agree on

22    something.  It's a start.  Okay.

23          So why don't we start by ticking through some of the

24    discovery disputes that you all raised.  I'm going to start

25    with the ones that were raised by Mr. Moser and see if we can

1    resolve some of it.

2             The first request -- well, so, I understand,

3    Mr. Moser, your initial problem with the objection that the

4    plaintiff has raised and made arguments about why these are

5    boilerplate and the like.  I guess my perspective is, if those

6    boilerplate objections are not otherwise keeping the plaintiff

7    from producing responsive documents, in other words, they may

8    have some boilerplate objections in there, but at the end of

9    the day, if they produce the documents and don't have

10   objections to producing them, then I don't think it's something

11   worth arguing about or complaining about at this point.

12            So what I'd like to do is just focus on the substance

13   of what you need and what you want, what you're asking for, and

14   whether plaintiffs have any legitimate objections to producing

15   those specific documents.

16            So I think that based on the letters, your letter

17   that the issues that are -- that plaintiff -- well, let me

18   start there.

19            Are there any objections that plaintiff have made, to

20   boilerplate objections or otherwise, that they had made that

21   then result in not producing documents other than the issues

22   you identified in your letter?  So those issues being tax

23   returns, cellphone records, the unemployment insurance file,

24   medical records regarding (indiscernible), workers' comp file,

25   retainer agreements, and travel records.  At least that's the

 1   list that I compiled based on your letters.  Is there anything
 2   else?
 3              MS. KALMANSON:  Your Honor, just one point on that.
 4   We did provide the unemployment authorizations.
 5              THE COURT:  Yes.  I did see that in your letter.
 6   Yeah, I did see that.  So that possibly is resolved.
 7              But let me ask Mr. Moser.  Is there anything else?
 8              MR. MOSER:  Well, from our perspective, we don't
 9   know.  We have made --
10              THE COURT:  Okay.
11              MR. MOSER:  And the reason why we don't know is
12   because the plaintiff has not stated whether or not he's
13   withholding documents pursuant to the boilerplate objections.
14              I agree with the Court, if the defendant had asserted
15   all these boilerplate objections and then clearly stated he's
16   not withholding any documents, then we would have -- I think
17   that would resolve the boilerplate issue.  But the issue that
18   we have is we have a whole bunch of objections, privilege, et
19   cetera, and there's no statement as to whether he's withholding
20   responsive documents.
21              THE COURT:  Okay.  And that's, you're saying,
22   separate and apart from the issues I just ticked off --
23              MR. MOSER:  Yeah.
24              THE COURT:  -- from the categories of documents?
25              MR. MOSER:  Correct.

```
 1              THE COURT:  Okay.  (Indiscernible).

 2              MR. MOSER:  And that's (indiscernible) every single

 3   document request he does not clearly state when asserting

 4   objections whether or not any documents are withheld as

 5   required by Rule 34 as of 2015.

 6              THE COURT:  Okay.  So when I was looking through the

 7   attached responses at least, if any of them (indiscernible)

 8   objections and then subject to with reservation produced

 9   nonresponsive -- will produce responsive, nonprivileged

10   documents or something to that effect, you're saying that even

11   with that language you're not certain whether there were

12   certain documents withheld based on the boilerplate objections.

13              MR. MOSER:  Yeah, absolutely not.  And it's not just

14   boilerplate objections.  They're saying that they're producing

15   only nonprivileged documents which leaves us guessing as to

16   whether privileged documents have been withheld.

17              We're just -- again, we're just asking that the

18   plaintiffs be clear.  If he's relying on these objections, it

19   would suggest that the purpose of the objections is to withhold

20   information, otherwise why object.

21              MS. KALMANSON:  Your Honor, if I may.

22              THE COURT:  Yeah, go ahead, Ms. Kalmanson.  Perhaps

23   you can clarify --

24              MS. KALMANSON:  Sure.  So --

25              THE COURT:  Based on the (indiscernible) letter it
```

1    seems like you were saying that, yes, we have these objections

2    but we still nevertheless produced documents.

3         MS. KALMANSON:  That's correct, your Honor.  And on a

4    meet and confer with Mr. Moser, we in fact told him we have not

5    withheld any documents on the basis of the boilerplate

6    objections.  We provided specific objections, most often with

7    case law, in the many letters that have gone back and forth.

8    With regard to the categories of documents that we have

9    withheld and those are the categories of documents that you

10   have identified, your Honor, the tax returns, the cellphone

11   authorizations, travel authorizations, and retainer agreements

12   with counsel, we believe they're beyond the scope.  We

13   legitimately believe they're beyond the scope.

14         I don't actually believe that there were any

15   privileged documents that were withheld.  If there were, we

16   will certainly produce a privilege log, and I'm writing that

17   down to do, but I don't believe that there were any.  But that

18   is our obligation, of course.

19         THE COURT:  Okay.  Right.  Okay.  So why don't I say

20   this.  I mean, I think that -- it's hard for me to say on this

21   phone call which of those interrogatory responses or

22   (indiscernible) fall into the category Mr. Moser is referring

23   to.  You made objections and he's not certain whether or not

24   you withheld any documents based on those objections, aside

25   from the categories that we're here to talk about today.

1            The one clarifying thing maybe for you to send a

2    letter to Mr. Moser that makes clear RFP by RFP saying,

3    notwithstanding these objections, we have produced responsive

4    documents, so that he knows which, if any, of the requests that

5    he made are still potentially at issue where he might have

6    issues with them.  It sounds like you covered that, right?  I

7    just want you to send a clarifying letter that confirms that

8    for him.

9            And, then, also confirm whether or not there are any

10   documents being withheld on the basis of privilege.  And if so,

11   release the privilege log, or at least in the first instance

12   let him know by letter if there were documents withheld on the

13   basis of privilege and then propose a timeline for when you'll

14   produce the privilege log.

15           MS. KALMANSON:  I can certainly do that, your Honor,

16   but I am looking -- and we have already done that.  On

17   July 12th we sent a letter to Mr. Moser where we said about the

18   objections, there are only four document requests out of 32

19   where plaintiff has refused to provide any documents, and in

20   those instances, plaintiff specifically stated the reason for

21   the objection was specificity and in some instances even

22   provided case law supporting our position.

23           THE COURT:  Okay, and so you identified which of

24   those four request --

25           MS. KALMANSON:  I'm not going to do it again.

Angela O'Donnell - Official Court Reporter
(914)390-4025

1          THE COURT:  I guess, Mr. Moser, why was that not

2    sufficient if plaintiff already did that?

3          MR. MOSER:  Because they have not stated, although

4    they state they have produced some responsive documents,

5    Federal Rule of Civil Procedure 34 explicitly requires them to

6    state whether or not they are withholding any documents

7    pursuant to objection.  If they are willing to just send me a

8    letter that says, hey, pursuant to Federal Rule of Civil

9    Procedure 34 we are not withholding any responsive documents

10   pursuant to our objections, I have no problem with that.

11         MS. KALMANSON:  Your Honor, my point is I'm happy to

12   do it if the Court wants us to do it, but we've already done it

13   and then we went into the specifics -- there are five -- no,

14   four requests that we withheld documents on in the same letter,

15   and we went through them and explained the reasons for the

16   objections.

17         I just feel like this is a lot of -- a lot of back

18   and forth to attempt to make us look bad when we've already

19   done this.  We're in compliance with our obligations.

20         THE COURT:  All right.  Well, I'm not -- let's put

21   aside looking bad or anything.  I don't think in those terms.

22   I just want -- I think more pragmatically in how to resolve

23   this so that you guys can move forward.

24         So I get that you think you've already done it, and

25   I've looked at the letters, it does look to me like you said

1    what you needed to say, but in the hopes of resolving this

2    issue and putting it to rest, why don't you reconfirm, if you

3    want to think of it that way, what you've already stated.  But

4    it sounds like this will give Mr. Moser assurance that you're

5    not withholding any documents on the basis of your objections

6    and just be clear about request this or that we have objections

7    but we haven't withheld any responsive documents based on those

8    objections.

9         You can identify any that still remain.  There may

10   not be after we have this conversation about the outstanding

11   objections.  I think the other objection for which you had

12   withheld documents are the ones we're about to talk about.

13        Am I right about that, Ms. Kalmanson?

14        MS. KALMANSON:  Yes, your Honor, and we will do that.

15        THE COURT:  Okay.  Okay.  So I'm not making a ruling

16   that you failed in doing what you were supposed to do.

17   Whatever you (indiscernible) I'd just like you to do it and

18   send that to Mr. Moser and at the same time confirm whether

19   you've withheld any documents on the basis of privilege and

20   provide a timeline for when you would produce a privilege log,

21   if you have withheld any documents on the basis of privilege

22   that you would need to do and haven't done yet; is that right?

23        MS. KALMANSON:  I don't -- to the extent that one is

24   necessary, yes, we will do it.  I don't know that we actually

25   withheld anything on the basis of privilege, but we will double

1    check and produce a log if necessary.

2              THE COURT:  Perfect.

3              So tax returns.  So explain to me, Mr. Moser, why do

4    you need the tax returns?  What do you hope to gain from them?

5    Is there any other document or set of documents that could

6    provide you some more information?

7              MR. MOSER:  Yes.  Thank you.

8              So Mr. Galvan is running his own landscaping

9    business.  And he has stated that he earned only $4,500 from

10   running his own landscaping business.  He also claimed that he

11   earns $100 a day for working for another company, but he's

12   basically asking the defendants to take him at his word with

13   regard to his income.

14             I know that there is a need in this case for the tax

15   returns.  In many cases where you have a plaintiff, for

16   example, who gets a stable job and has a W-2 at the end of the

17   year that shows that they earned, I don't know, $50,000 or

18   $80,000, the calculations can be done in a very straightforward

19   way.  And in those types of cases, tax returns are not

20   necessary.

21             But when he's running his own business and he's not

22   even answering interrogatories with regard to the extent or

23   nature of his income, he's asking basically for the

24   plaintiffs -- the defendants and the trier of fact to take him

25   at his word that he's only earned, it looks like less than

1    $10,000.  And for that reason we think that it's appropriate to

2    obtain the tax returns in this case and I don't think he'll be

3    prejudiced by that.

4           Again, if he was not asserting a discrimination claim

5    or claim for future lost earnings, of course this would be a

6    nonissue in a FLSA case, but he's obviously raised this issue

7    and we need the tax returns.

8           THE COURT:  Okay.  So Ms. Kalmanson, is it true that

9    your claims include future lost earning?

10          MS. KALMANSON:  Yes.  We're seeking -- we're seeking

11   economic damages here.  But we provided the information that we

12   were required to provide and tax returns are under a heightened

13   standard.  That's just not necessary here.

14          We included in our, in our interrogatories the

15   compensation that plaintiff received.  We included -- we

16   included unemployment insurance files.  We included, I believe,

17   invoices.  And Mr. Moser has an opportunity to depose our

18   client.  He doesn't need the tax returns.

19          THE COURT:  But this is about --

20          MS. KALMANSON:  He doesn't meet the heightened

21   standard.

22          THE COURT:  So tell me about -- the issue, I guess,

23   is that since leaving the defendants' employment, he started

24   his own business; is that the issue?  And so then -- or was

25   this -- is that what we're talking about or was this business

```
1   being run while (indiscernible) being employed by defendant?
2           MR. MOSER:  I'm sorry, your Honor.  Were you
3   addressing me with that question?
4           THE COURT:  No, I'm asking Ms. Kalmanson.
5           MS. KALMANSON:  Oh, I'm sorry.
6           THE COURT:  Explain to me -- from what I understand
7   from Mr. Moser, the issue is that the plaintiff is running his
8   own business and he said how much he's made, the amounts, and
9   that to the extent future lost earnings are going to be
10  calculated, it's based on comparing those -- if I understand
11  the law correctly -- it's based on looking at what he's
12  currently making versus what he claims he would have made if he
13  hadn't been terminated inappropriately; is that your
14  understanding?
15          MS. KALMANSON:  I'm not --
16          MS. COHEN:  Your Honor, this is Randi Cohen.  In
17  every single employment discrimination case the terminated
18  employee has an obligation to mitigate his damages and seek new
19  work.  And yes, Mr. Moser is correct, it is simple if somebody
20  has a W-2 job or an offer letter and things that are black and
21  white.
22          We dispute the contention that Mr. Galvan has started
23  a competing business, that he was doing anything competitive
24  while he was working, and in any event, there is no noncompete
25  here, so that's just a threatening line that is of no moment
```

1  here.

2          With respect to what he has earned following his

3  termination, we have provided all of the information that we

4  are required to provide and Mr. Moser is free to depose

5  Mr. Galvan on the subject.  To the extent that following his

6  deposition there are additional documents that it is

7  appropriate to call for, he is free to do that.  But at this

8  juncture there is no basis to impede on his privacy with the

9  discovery of tax returns, (indiscernible) only on security

10  records.

11          THE COURT:  (indiscernible).  Okay.  We're not

12  talking about that yet, we're just talking about tax returns at

13  the moment.

14          So tax returns, I want to understand, is the dispute

15  right now that he, after he (indiscernible) working on his own

16  business and so that -- the records relating to that haven't

17  been produced?  I'm just trying to under -- or has he been --

18          MS. KLETTER:  Yeah, Mr. Moser is making an

19  assumption, because we provided him with a document where

20  Mr. Galvan invoiced a company where he did two weeks of work,

21  and he said it was Galvan Landscaping.  He doesn't have a

22  business.  So it's --

23          THE COURT:  From your perspective --

24          MS. KLETTER:  -- two weeks of work that he did.

25          THE COURT:  Okay.  So since he's been terminated, is

```
 1   it your contention that he's been unemployed or has been

 2   employed by some other company?  What's your contention in this

 3   case?

 4           MS. KLETTER:  Yeah, so --

 5           MS. KALMANSON:  He has done odd jobs -- go ahead,

 6   Joni.

 7           MS. KLETTER:  Yeah.  He's earning $200 per week

 8   working for a landscaping company, which we had informed

 9   Mr. Moser.  He also mows his daughter's lawn and gets about

10   $150 a month.

11           THE COURT:  I see.  And so --

12           MS. KALMANSON:  And at some point he received

13   unemployment which we put the amounts in as well as the

14   documentation supporting and his authorization.

15           (AT&T AUDIO MESSAGE: Judge Resnick's chambers, has

16   left the conference)

17           THE COURT:  Are you still there, everyone?

18           MR. MOSER:  Yes.

19           MS. KALMANSON:  Yes.

20           THE COURT:  Okay.  Just making sure.

21           And when was Mr. Galvan terminated?

22           MS. KALMANSON:  March of 2023.  Right?

23           THE COURT:  Okay.  And so what has been produced in

24   terms of this issue of mitigation of damages or the amount he's

25   been making since he was terminated?  What have you produced up
```

1    till now?  You keep repeating that you produced everything you

2    were supposed to produce, so can you describe for me what it is

3    you produced so far?

4              MS. KALMANSON:  Yes.  In the interrogatory responses

5    we listed out the amounts of money that he has received since

6    his termination.  We've produced his unemployment insurance

7    documentation and we have produced --

8              What were these, invoices, Joni?

9              MS. KLETTER:  The invoice from the painting company

10   that he did a little bit of work for but this is -- yeah --

11             THE COURT:  Go ahead.

12             (AT&T AUDIO MESSAGE;  Judge Reznik's chambers has

13   joined the conference)

14             THE COURT:  Okay.

15             MS. KLETTER:  Yeah, I don't think there are any other

16   documents related to it.

17             THE COURT:  And there haven't been any W-2s or

18   paystubs or anything like that that exist that need to be

19   produced?

20             MS. KALMANSON:  We are not in possession of any of

21   those at this time, and I don't think he's had W-2 employment.

22             And frankly, the irony here is that this is a case

23   about the defendants not properly recording employees' wages,

24   paying partially in cash, not paying taxes on wages properly.

25   The defendants are trying to cloak plaintiff with its own

1    misconduct.

2            THE COURT:  Okay.  So then at this point you're

3    saying, if I understand correctly, Ms. Kalmanson, Ms. Kletter,

4    Ms. Cohen, the whole argument that Mr. Moser is relying on to

5    get the tax returns, which is the existence of his own

6    business, you're saying, is a fabrication.  There is no other

7    business; am I right about that?

8            MS. KALMANSON:  It's a manipulation.  He works odd

9    jobs, yes.

10           MS. KLETTER:  He works odd jobs and the fact is what

11   we are representing is that we've provided all the information

12   about the money that he has made.  Mr. Moser is entitled to

13   depose our client.  It's improper for him to get tax returns at

14   this juncture.  It's beyond --

15           THE COURT:  Okay.

16           MS. KALMANSON:  It's beyond what is necessary.

17           THE COURT:  Okay.  So here's what I would say, at

18   this point --

19           MR. MOSER:  Your Honor, may I be heard?

20           THE COURT:  You can say what you need to, Mr. Moser,

21   but then we're going to move on.

22           Go ahead.

23           MR. MOSER:  Understood.

24           So whether he's earning -- whether he's -- he

25   provided to us an invoice from Galvan Landscaping which shows

                Angela O'Donnell - Official Court Reporter
                            (914)390-4025

1    that he was paid money for a side job.  The plaintiffs are

2    admitting that he performs odd jobs and earns income from them.

3    That is income and we rely on him to tell us what his income

4    was from these odd jobs.  It's simply not a case where a W-2 at

5    the end of the year makes it clear what this man is actually

6    earning.

7              So for that reason we, again, we -- he's the one

8    who's put this at issue by alleging future lost earnings, not

9    the defendants.

10             THE COURT:  So for the plaintiff, Ms. Kalmanson, is

11   there an interrogatory response that you provided to the

12   defendant that lays out the detail of Mr. Galvan's income after

13   he's terminated --

14             MS. KALMANSON:  Yes, your Honor.

15             THE COURT:  -- to the extent you (indiscernible) able

16   to pull it together?

17             MS. KALMANSON:  Yes.

18             THE COURT:  Okay.

19             MS. KALMANSON:  Yes.  We've already provided that.

20   He is entitled to depose our client as to it, and those

21   requests for tax returns is premature.  If after the deposition

22   this is something that defendant believes he needs, we can

23   revisit it then, but it's premature at this point.  I mean,

24   that's the case law we provided.

25             THE COURT:  Well, I think the case law says that, in

1    general, the burden for Mr. Moser to obtain tax returns is

2    slightly higher.  You have to show not just that they're

3    relevant but there's a compelling need for them and that the

4    information cannot be obtained through other less intrusive

5    means.  So I think that definitely is the case law.

6         So I guess what I would say at this point is for now,

7    I would agree with the plaintiff that tax returns aren't

8    absolutely necessary.  It's not clear to me that there aren't

9    alternative documents or means to obtain the information less

10   intrusively, but this is without prejudice for Mr. Moser to

11   request these documents at a later time after the plaintiff is

12   deposed or after further discovery and so we'll leave it at

13   that for now.

14        MR. MOSER:  Thank you, your Honor.

15        THE COURT:  So in terms of the unemployment insurance

16   file, it seems like that issue has been resolved.

17        Am I right about that, Mr. Moser?

18        MR. MOSER:  Correct.

19        THE COURT:  Okay.  So that's off the table.

20        What about medical records regarding the disability?

21   Are those still in dispute?

22        MS. KALMANSON:  We produced medical records, your

23   Honor.

24        THE COURT:  Okay.

25        Mr. Moser, you agree?  Is that off the table?

1          MR. MOSER:  He has produced some -- some discharge

2    papers.  That's the only thing that he's produced.  However,

3    they have furnished a single medical authorization, to the

4    extent that he only sought that medical provider, I think we

5    can just obtain those directly from the source.

6          MS. KALMANSON:  Yeah, we've provided HIPAA forms, one

7    HIPAA form.

8          THE COURT:  Okay.  So for now that's off the table.

9          There's workers' compensation file, is that still in

10   dispute?

11         MR. MOSER:  From the defendants' perspective, yes.

12   To the extent that the authorization comes back and says, hey,

13   there's no file, we don't have a file for him, we're okay with

14   that.  We would just want the authorization.

15         THE COURT:  Ms. Kalmanson, what is your position on

16   that?

17         MS. KALMANSON:  He didn't apply for workers'

18   compensation.  I don't know why we have to provide

19   authorizations for that.

20         THE COURT:  Okay.

21         MS. KALMANSON:  And they know he didn't apply because

22   they're the employer.

23         THE COURT:  Okay.  So then can you just confirm --

24   have you confirmed before this call that he didn't -- that

25   there is no reason for that authorization because he never

1    applied for workers' compensation?  Is this something --

2              MS. KALMANSON:  I believe we have put that in

3    writing, but to not belabor the point, I will put it in a

4    letter that I am sending again.

5              THE COURT:  Okay.  Perfect.

6              So from my perspective that's a resolved issue.

7              So that leaves us with cellphone records and a couple

8    of other things.

9              Cellphone records.  So Mr. Moser, explain to me why

10   you need cellphone records.  What do you hope to gain from that

11   information?

12             MR. MOSER:  Yes.  The plaintiff had a company-issued

13   cellphone for 20 years.  And then shortly before his

14   termination, but after he claims the discrimination began, he

15   lost his company-issued phone.  So that's gone and all the

16   communications on that are gone, but mysteriously, he

17   volunteered to pay for his own phone, and he is claiming that

18   he took a lot of actions to mitigate his damages.  We believe

19   that -- we're seeking those -- we're not looking for all of his

20   cellphone records, we're just looking for a call detail report

21   for a brief period of time in order to establish whether or not

22   he was using that cellphone to seek alternate employment.

23   That's all we're looking for.

24             THE COURT:  Okay.  And you think by getting those

25   records -- what are you going to learn?  You're going to see a

1    list of phone numbers, then what are you going to do?

2              MR. MOSER:  Well, we'll be able to use that at his

3    deposition to determine, you know, whether or not he was

4    actually making calls and who these calls were to.  That's all

5    we're looking for.  We're not looking for -- again, we have the

6    burden of proving that he didn't mitigate damages.  Not him.

7    So that's why we're looking for those records, especially

8    because of the loss of the cellphone just before he leaves.

9    Ordinarily, we would have some of that information but we

10   don't.

11             MS. KALMANSON:  Your Honor, this is --

12             THE COURT:  Go ahead.

13             MS. KLETTER:  This is a sideshow.  The cellphone

14   records for the purported use Mr. Moser is representing that he

15   would like them for all (indiscernible) in service of

16   theoretically trying to challenge his efforts at mitigation.

17   This is a damages question.  We can have an inquest on damages

18   after we easily establish the liability at issue here.

19             This is a sideshow.  Defendants have barely produced

20   anything and we are in the weeds in minutia of the legal

21   documents that we're trying to withhold for privacy.  He wants

22   a call log to see who this guy is talking to?  That's really

23   beyond the pale, particularly when he hasn't even been deposed

24   yet.

25             THE COURT:  Well, can you address the point he is

Angela O'Donnell - Official Court Reporter
(914)390-4025

1    making, which is that he thinks somehow that looking at his

2    records he'll be able to identify whether he's been making

3    phone calls in that short term time period to find alternative

4    work?

5              Do you disagree?  What is your response to that?

6              MS. KLETTER:  I do disagree.  And let's just take

7    this in a hypothetical.  Let's say there's ten phone calls in a

8    week; his daughter, his brother, a pharmacy, a supermarket.  I

9    have no idea who this guy has talked to, right?

10             He's going to see a phone record for the pharmacy.

11   Now, Mr. Galvan is going to have to answer whether he was

12   calling about a prescription or to see if they needed a clerk

13   for the front register?  This is what he wants to spend his

14   hours deposing him on?  I'm sure it's not.  This is all a

15   tactic to invade his privacy and drive up costs to try to be a

16   bully.

17             THE COURT:  Okay.  And what about travel records?

18   Explain to me, Mr. Moser, what travel records are you actually

19   seeking and why.

20             MR. MOSER:  Yeah.  So just about the time that

21   Mr. Galvan lost his company cellphone, he also obtained a

22   brand-new passport.  And the brand-new passport has very little

23   information in it.  Of course it only has information following

24   September of 2022.  And he -- just to clarify, Mr. Galvan was

25   paid every single week a salary, regardless of whether he

```
 1    showed up to work.  And he's claiming that he worked every
 2    single week.  My client is saying, no, this is not the case.
 3    He did not work every single week.  He was in Mexico sometimes
 4    for a month at a time or three weeks at a time and he traveled
 5    extensively.
 6              Mr. Galvan -- we're just asking for his travel
 7    records so that -- because, again, my client, unfortunately,
 8    unfortunately, we did not, we did not keep many records about
 9    his travel.
10              MS. KALMANSON:  Your Honor --
11              THE COURT:  Go ahead, please.
12              MS. KLETTER:  Kim, let him finish.
13              MR. MOSER:  Yeah.
14              And, you know, the idea that we're somehow being a
15    bully here, I just want to put this in perspective.  We have a
16    man who's claiming $2 million in damages from a family-owned
17    landscaping company.  I disagree with regard to who the bully
18    is here.  And you know -- that's all I have on that issue.
19              THE COURT:  But explain to me what travel records?
20    What does that even mean?  What are the travel records you're
21    looking for?
22              MR. MOSER:  So with his authorization, we can -- with
23    modern technology, we can get his travel records from the FAA.
24              MS. KLETTER:  But, your Honor, it doesn't matter if
25    he was traveling.  It's completely irrelevant.
```

1              THE COURT:  Let us do one at a time because by phone,

2    it's hard for me to hear you both at the same time.

3              So Mr. Moser, why don't you finish -- (indiscernible)

4    get his record, that's assuming if he's traveling by plane.

5              MR. MOSER:  You know he always traveled by plane.  He

6    always traveled by plane.

7              THE COURT:  Okay.  So that's what you're seeking.

8    You want to get records over what period of time?

9              MR. MOSER:  For the time period that he's claiming

10   that he worked overtime, and that would be from 2019 to 2023,

11   the end of his employment.

12             THE COURT:  Okay.

13             MS. KLETTER:  Your Honor (indiscernible).

14             THE COURT:  Let me just finish with Mr. Moser to see

15   if I have any questions before you respond.

16             So you have -- if you get these record, what you're

17   hoping is you'll see when he has traveled over certain periods

18   of time.  So how will that work with the argument about

19   overtime?  Meaning, you think that you'll be able to track the

20   time that he was traveling and say that he's claiming overtime

21   for periods that he was not working?

22             MR. MOSER:  Absolutely.  And if we had -- what we

23   understand is the following.  We have punch records for a

24   certain period of time, but there are big holes in those punch

25   records.  He's going to say he worked but didn't punch in.  And

1    so -- and that's my understanding based upon what was

2    represented that he worked 60 hours every single week.  So

3    we're just looking for information regarding his travel.

4              THE COURT:  Okay.  And is there any other means to

5    obtain information about whether or not he was actually working

6    during these OT periods or not?  Aside from looking at the

7    travel records, have you explored other options?

8              MR. MOSER:  I discussed this with my client.  There's

9    nothing else that would be as succinct or which would be as

10   comprehensive as simply obtaining his FAA travel records.

11             THE COURT:  Do you have -- I mean, during the period

12   that he had overtime, do you have information or records about

13   which client he worked for or not?

14             MR. MOSER:  So could you repeat the question, your

15   Honor?

16             THE COURT:  Sure.  You have his claim for overtime

17   for certain periods of time.

18             MR. MOSER:  Yes.

19             THE COURT:  Do you have records internally that let

20   you know where he should have been working during those

21   periods?

22             MR. MOSER:  Hmm.  Not always, your Honor.  I'll

23   consult with my client about that.  I see what the Court is

24   suggesting and let me speak with them about that.  I don't

25   believe -- again, this is a father/son operation.

1              THE COURT:  Right.  I get it.  I get it.  It's a

2    small operation.

3              MR. MOSER:  Yes.

4              THE COURT:  But I guess I'm just trying to understand

5    why this is the most efficient or effective way to get at what

6    you're trying to get at.  So I'm just trying to understand what

7    you are --

8              MR. MOSER:  Well --

9              THE COURT:  Go ahead and then I'll ask Ms. Kalmanson

10   and others to respond.

11             MR. MOSER:  Simply because -- it is not intrusive.

12   All we have is his travel records.  We can see when he was on a

13   plane and when he came back.  It's actually reliable and,

14   again, it's nonintrusive.  We're just asking for when he was

15   here and when he wasn't here; nothing more, nothing less.

16             THE COURT:  Okay.  So let me ask the plaintiffs to

17   respond.  Plaintiff to respond.

18             MS. KALMANSON:  Yes.  Thank you, your Honor.

19             We have disclosed to Mr. Moser in a five-year period

20   when Mr. Galvan acknowledges that he was not at work for

21   vacations or illness or otherwise.

22             We maintain that it is the employer's burden,

23   recordkeeping burden, whether they are a mom-and-pop business,

24   a set of working parents who have a nanny, or whether they're

25   Walt Disney Company, they have a recordkeeping burden to keep

1    track of when employees are at work, what hours they are paid,

2    and how their pay is calculated.  This is an end run around

3    their own failure to comply with their recordkeeping

4    obligations.

5            Had Mr. Galvan requested booking confirmations for

6    travel or hotel reservations for travel or any other narrowly

7    tailored means to show that he wasn't at work at times that

8    he's represented that he's at work, we would consider that.

9    But he asked for, I don't remember the exact number, multiple

10   versions of ways to get Homeland Security records.  That's not

11   proper.

12           THE COURT:  Okay.  And then last, I think the last

13   thing on my list, I just want to tick these off, is retainer

14   agreements.

15           So Mr. Moser, explain to me why you need that.

16           MR. MOSER:  At this point we're withdrawing that

17   claim.  We're not going to pursue the retainer agreements.

18           THE COURT:  Okay.  So then is there anything else

19   that you're seeking that I haven't asked you about so far?

20           So we have the cellphone records and travel records

21   still remaining.  Is there anything else that I missed?

22           MR. MOSER:  Let me just take a look very quickly,

23   your Honor, because there's so much going on here.

24           I believe that's it.

25           THE COURT:  Okay.  So based on what I've heard, to me

```
 1    it sounds like the potential relevance of the cellphone records
 2    and travel records is tenuous at best, and that there are other
 3    less intrusive means, I think, that you can get at the same
 4    kind of information.  It doesn't strike me that going to
 5    Homeland Security for travel records is the most effective or
 6    most efficient way to get at the evidence that you're looking
 7    for and I do think that it's more intrusive than it needs to
 8    be.
 9              Similarly with the cellphone record, at the end of
10    the day, I just don't see how that's going to advance the ball
11    as much as you think, and it is more intrusive than necessary.
12              So for now I'm going to deny those requests.  You
13    can -- if for some reason after further discovery and attempts
14    to get at the same information in less intrusive ways you are
15    unable to and you have a good faith basis for still needing
16    those records, then you can ask it.  You can come back and we
17    can talk about it again.  But for now, I don't see how they're
18    necessary at this point.
19              I think that covers the issues that --
20              MR. MOSER:  Clarification, your Honor -- sorry.
21              THE COURT:  Go ahead.  Clarification.
22              MR. MOSER:  Yeah, those requests are being -- the
23    motion to compel is being denied without prejudice.
24              THE COURT:  Yes.
25              MR. MOSER:  Okay.  Thank you.
```

```
1              THE COURT:  So I guess that -- were there other
2   issues on the plaintiff's side?  You brought a couple of issues
3   up in the letter.  Did you want to address those?
4              MS. KALMANSON:  Your Honor, yes --
5              MS. COHEN:  Yes, your Honor.
6              MS. KALMANSON:  Go ahead, Randi.  You --
7              MS. COHEN:  No, no, no, you go, Kim.  You're closer
8   to this than I am.
9              MS. KALMANSON:  So we've been through Mr. -- through
10  defendants' production and we do not believe that they have
11  done a fulsome search of ESI.  Mr. Moser was going to check on
12  that.  We had a meet and confer on July 25th.  He said he'd get
13  back to us July 31.  He didn't.  And then earlier this week he
14  was going to get back to us and he stated that he was tied up
15  with a brief.
16             We need to advance the ball on this.  We haven't
17  formally moved to compel at this point, but we need the
18  documentation to move forward.  We will -- if forced to move to
19  compel, we will do so, but I bring it up on the call to try to
20  avoid that.
21             THE COURT:  Okay.  So tell me a bit more about,
22  Mr. Moser, where do things stand on ESI?  Have you looked into
23  it?  What's your position?
24             MR. MOSER:  So again, this is a -- this is a -- this
25  is a small landscaping company.  It's my understanding that
```

1    Mr. Galvan is claiming that my clients texted with each other
2    concerning him and that he believes that those text messages
3    are relevant.  We -- just for clarification, we haven't seen
4    any text messages from Mr. Galvan's phone that concern his
5    employment or communications with any of our clients.
6            And I did mention to plaintiff's counsel that I would
7    look into this.  Unfortunately, though, I've been spending my
8    time drafting motions and doing other things, but we're willing
9    to -- we're willing to work in good faith to try and attempt --
10   to attempt to resolve this.
11           THE COURT:  Okay.  So then the question is really
12   timing.  Can we set a timeline for the two of you to -- for
13   Mr. Moser to look into the ESI issue and get back to the
14   plaintiff so that we can move the ball forward on that?
15           How long will it take you, Mr. Moser, now that these
16   issues will get resolved that you've been writing letter
17   motions about to get to the bottom of the ESI question?
18           MR. MOSER:  I would like Friday, but I think Monday
19   would be better.  I think --
20           THE COURT:  Okay.  Monday, the 19th?
21           MR. MOSER:  If we could have a week, that way I'm not
22   up against any deadlines and I have enough time to speak to my
23   client in detail.
24           MS. KALMANSON:  Your Honor --
25           MS. KLETTER:  Your Honor --

1          MS. KALMANSON:  We don't object to the week, but we

2     will need more time for discovery, if that's the case.

3          But that being said, what I'm hoping that we can do

4     is have deliverables, right?  What searches were performed?

5     What search terms were used?  How were they performed?  Who

6     performed them?  So that we're not in a week back at, yeah,

7     they searched ESI, there's nothing there, right?

8          It is inconceivable to me that there's not a single

9     piece of ESI.  The defendants have an affirmative duty to

10    search ESI.  We are now more than a month past the discovery,

11    the production deadline.  We're more than a month past our

12    deficiency notice.

13         MS. KLETTER:  And this is the third representation,

14    this is the third representation from defendant that they'll

15    talk to their clients and get back to us.

16         So, you know, we've already seen a demonstration that

17    there's not a good faith effort to work this out, and we will

18    be seeking costs if we have to bring this back to the Court's

19    attention.  This isn't a matter of my client searched their

20    text messages.  This isn't a matter of my clients searched

21    their text messages on their own and I trusted them with what

22    they told me.  Defendants have an affirmative obligation for

23    the attorney or a vendor to oversee the searches, the

24    parameters that were put in place, and to report back how those

25    searches were run.

1          THE COURT:  Okay.  So Mr. Moser, when you go back to

2   do your search, what were you planning to do?

3          MR. MOSER:  I was planning on discussing this with my

4   clients to see if ESI actually exists.  You know, the idea --

5   we're talking about a small company here.  If they're willing

6   to pay for -- they would be the ones to have to pay for it

7   anyway.  I mean, we're not -- the defendant -- the

8   plaintiffs -- excuse me.  The plaintiff has not searched for

9   any ESI.  We have no reports of any searches for ESI on the

10  plaintiff's end.  If we're going to do this, then it should be

11  a mutual disclosure.

12         MS. KALMANSON:  But how can you make a representation

13  about the searches that we've conducted, your Honor, and

14  Mr. Moser, which you've never asked?

15         THE COURT:  So this --

16         MS. KALMANSON:  (Indiscernible).

17         MR. MOSER:  Listen.

18         THE COURT:  We're talking about ESI relating to what,

19  phone, text messages, or something else?

20         MS. KALMANSON:  Text messages and emails.

21         MR. MOSER:  If they want to do this, your Honor, I

22  have no issue with that.  But we want Galvan's cellphone as

23  well if they're going to be looking into this.  Again, the

24  Court already said that a simple list of phone calls is

25  intrusive.

1          THE COURT:  Mr. Moser (indiscernible).

2          MS. KALMANSON:  But the (indiscernible).

3          Sorry, sorry.

4          MS. KLETTER:  Mr. Moser, we provided you with certain

5    text messages and we are not withholding anything.  And he's

6    looked through his texts.  We know --

7          MR. MOSER:  Okay, so (indiscernible).

8          MS. KLETTER:  We know that David and Evan Ferraro

9    texted with each other on a daily basis, and in our document

10   requests you said that you didn't have documents for over half

11   of the documents that we made requests about, including

12   policies, overtime compensation, payments, you know, and all of

13   these things, and it's incredulous to us that these two people

14   who are the defendants in this case don't have any text

15   messages or emails relating to these matters.  And it's your

16   affirmative obligation to go and oversee it.

17         THE COURT:  Okay.  So let's take it down a notch and

18   let me just say this.

19         Let's put aside the question of vendors and all of

20   that.  The first step is for Mr. Moser to go back to his

21   clients and do a complete check about what type of emails they

22   may have or documents, electronic documents they have relating

23   to this case that are responsive, as well as text messages.

24   That would be their first step; identify the universe of what

25   may be out there and what may be responsive.

1          And then we can talk about a mutual way in which both

2    sides are conducting searches to produce them.  I don't know

3    if, for example, the plaintiff, as part of your production of

4    text messages, you used a vendor or whatnot, or how you went

5    about doing it.  But it seems to me it makes sense that it

6    would be a mutual effort on both sides to locate responsive

7    documents, if they exist.

8          So Mr. Moser, go back to your client.  Do some

9    analysis to figure out what, if anything, exists and meet and

10   confer -- get back to the plaintiff within a week's time, which

11   is Wednesday, August 21, with information about what you've

12   learned and how you propose to go about producing it, if it

13   exists.

14         MR. MOSER:  We will.

15         THE COURT:  Okay.  The parties, I guess -- well,

16   we'll take one thing at a time.

17         So that's the ESI issue, which I'll expect the

18   parties to be meeting and conferring about after Mr. Moser

19   responds by Wednesday, August 21, with that information.

20         What else, from the plaintiff's perspective, needs to

21   be addressed?  Anything else left on your side?

22         MS. KALMANSON:  The ESI is the primary issue, your

23   Honor.

24         THE COURT:  Okay.

25         MS. KALMANSON:  If Mr. Moser represents that all the

1    paper files were searched, then he's an officer of the Court.

2    We would have no way of knowing if paper files weren't

3    produced, or if the documents that defendants say don't exist,

4    actually don't exist.  We're taking his representation for

5    that.  It is -- the ESI is the primary issue.

6            THE COURT:  Okay.  And just for the record, that's

7    how it is in every case.  I mean, parties review and look for

8    documents, and they confirm whether or not they exist and

9    that's usually how it works.

10            So let me ask you then, is the only other thing

11    outstanding then the motion to quash or are there any other

12    discovery disputes that the parties have at this point?

13            MR. MOSER:  Your Honor, I hate to bring it up, but

14    since you asked, the interrogatory responses we gave

15    multiple -- they just, frankly, haven't been responded to

16    completely.

17            Like, for instance, Mr. Galvan said that he's

18    provided information about all of his income.  He says that

19    he's been earning $200 a week from a company, but he doesn't

20    say how much his total earnings have been since he was

21    terminated.  And they've just -- although Judge Seibel's order

22    specifically permits fact interrogatories, they have refused to

23    answer ten fact interrogatories.

24            THE COURT:  Okay.  So does this relate back to the

25    issue we started with the tax returns?  So what his earnings

1    have been since he was terminated?

2         MR. MOSER:  These are -- these are numerous -- these

3    are interrogatories regarding mitigation of damages, lost

4    wages, again, which the defendants and the plaintiffs agreed

5    would be produced in the order that was submitted to Judge

6    Seibel and then signed by Judge Seibel.

7         THE COURT:  Right.  So as I understood it, the

8    plaintiffs were saying that they had provided that information

9    in their interrogatory responses.  Is what you're raising that

10   you think those are still insufficient because they don't

11   provide enough detailed information?

12        MR. MOSER:  Correct.  Correct.  And that's with

13   regard to several of the interrogatories.

14        Interrogatory number 3, 5, 14, they ask for details,

15   and interrogatory number 2, which are simply not provided, and

16   then there is a flat objection to ten fact interrogatories.

17        THE COURT:  Okay.  So I can't get into those, which I

18   don't have in front of me what those interrogatories are that

19   you're referring to, but I guess what I'll ask, to the extent

20   we're talking about interrogatories that required or has

21   information about Mr. Galvan's earnings or lost income, I'll

22   ask the plaintiff to respond to that.

23        I think you started by telling me when we were

24   arguing about tax returns that you provided all that

25   information in your interrogatory responses.

1           MS. KALMANSON:  Yes.

2           THE COURT:  That appears to be what Mr. Moser is now

3    saying might be deficient.  What do you say to that?

4           MS. KLETTER:  That's correct, Judge.  It was provided

5    in the interrogatory response, and then there's other

6    interrogatories that -- where he states -- he has a question

7    like state all the facts that support your belief that

8    defendants illegally discriminated you.  Now, that is something

9    that's outlined in the complaint and we did supplement our

10   interrogatories to provide more information, but there are

11   certain interrogatory requests that he made that are still

12   objectionable because he's asking for all facts.  And as we've

13   stated, it's outlined in the complaint and it's also something

14   you can ask about at deposition.

15          THE COURT:  Okay.  So I think that in general I tend

16   to agree that it will be more efficient for that type of

17   information to be obtained through further deposition.

18          MR. MOSER:  Your Honor, if I could be heard on this.

19          MS. KALMANSON:  But to the extent that there's --

20   when it comes to the --

21          THE COURT:  The income issue, or the earnings, I

22   think that was something we started with.  So I think that's

23   something that's still worth addressing, because I had denied

24   the request for tax returns with the understanding that

25   information provided by the plaintiff was sufficient at this

1   point and that plaintiff would be deposed.

2            What I think what Mr. Moser's arguing is whether

3   information provided on that front is sufficient.

4            Is that what you're saying, Mr. Moser?

5            MR. MOSER:  Precisely.  And with regard to the fact

6   interrogatories, again, this is something that -- if he's not

7   willing to state all the facts, state the material facts.

8            What we don't want is the ground to start shifting.

9   I think if he shows up at a deposition and he can

10  comprehensively answer most of these interrogatories, then I

11  think we're fine.  But what happens when we get to the

12  deposition and we ask him for a list of all dates in which he

13  traveled?  And --

14           MS. KLETTER:  Right.  I think the Judge already ruled

15  on that, that you could then come back, you could come back and

16  get the records.

17           MR. MOSER:  And he can't provide that --

18           THE COURT:  Right.

19           MR. MOSER:  What happens when -- what happens when we

20  get to the deposition and we ask him for a list of every single

21  person who he did a side job for and he doesn't have that?

22  These are all interrogatories that require research.  To the

23  extent that he can answer these honestly at his deposition and

24  counsel is willing to represent that he can answer these

25  interrogatories at a deposition, I have no issues with that.

1  But these are not the types of interrogatories that a plaintiff

2  will simply know off of the top of his head.

3          MS. KALMANSON:  To the extent they're (indiscernible)

4  interrogatories --

5          THE COURT:  So these are contention interrogatories

6  that under Judge Seibel's rules, are allowed, is that what --

7  so I understand what we're dealing with.

8          MS. KALMANSON:  Your Honor, contention

9  interrogatories are -- Rule 33.3 doesn't apply pursuant to

10  Judge Seibel's order; however, the interrogatories that we have

11  objected to are interrogatories that are broad contention

12  interrogatories, state all facts that lead you to believe that

13  plaintiff was discriminated against.

14          When we're talking about the dates he traveled, when

15  we're talking about the amounts he learned, we answered those

16  interrogatories.  If Mr. Moser is unhappy with our answers, it

17  doesn't mean that they're false.  And he has an opportunity to

18  depose our client.  If we have to revisit this after the fact,

19  we can, but it is not our burden to restate every single

20  allegation in the complaint in an interrogatory, to state all

21  facts that lead us to believe he was discriminated against.

22  They're already in the complaint.  He will speak to them in his

23  deposition.  That is a different issue than what dates did you

24  travel on.  Yes, he will testify truthfully.  Will he remember

25  every single date he traveled in the last five years?  I'm sure

1    he will not.  Because I wouldn't.  Right?  But those are listed

2    in the interrogatories.

3           If there is an inconsistency that comes up in the

4    deposition that Mr. Moser wants to inquire about further, then

5    we can revisit this conversation.  But this is all much ado

6    about nothing.  We answered --

7           MS. KLETTER:  Also --

8           MS. KALMANSON:  -- in the prior answer.

9           MS. KLETTER:  Yeah.  It's also a very straightforward

10   case.  There's not going to be any surprise, gotcha, Mr. Moser.

11   We have nothing to hide here.  So it's not as if we're trying

12   to like hide secrets.

13          THE COURT:  So I think for now what I will say,

14   Mr. -- so here's what I'm going to say.  We are going to -- I

15   think -- I need -- I haven't allotted the whole afternoon,

16   unfortunately, to resolve all the issues today, but here's what

17   I would say.

18          At this point, Mr. Moser, I think it's premature to

19   really argue or raise issues about the completeness of that

20   interrogatory request.  I think you have the facts you need to

21   move forward.

22          The plaintiff will be prepared at his deposition to

23   answer what he can using the interrogatory responses that

24   you've been given.  To the extent you think that it's

25   incomplete or there's more information that needs to be

1    obtained, then there will be time in discovery to obtain it.

2    If you think it's based on some misdeed of the plaintiff in

3    responding to discovery, you can raise it with the Court at

4    that time.  But at this point, I don't think there's

5    anything -- it's premature for us to argue about this.  I think

6    you have what you need to move forward.  But I understand your

7    concern and you can always raise it at a later time if you

8    don't get the information you need.

9         Let's move on just briefly to the (indiscernible), I

10   think that's the only thing remaining.  That at least is ripe

11   in my mind.

12        Unless, plaintiff, is there anything else that I

13   didn't address in the letter you raised?

14        MS. KALMANSON:  No, your Honor.

15        THE COURT:  Okay.  And Mr. Moser, there's nothing

16   else from your letters.  I'm not inviting you now to raise new

17   issues that haven't been addressed in the letters.  Is there

18   anything in your letters that I haven't addressed?

19        MR. MOSER:  No.

20        THE COURT:  So motion to quash.  As I understand it,

21   these are nonparty customers that it sounds like the plaintiffs

22   have already served those subpoenas; am I correct?

23        MS. KALMANSON:  That is correct, your Honor.

24   Defendants --

25        THE COURT:  Okay.

1          MS. KALMANSON:  Defendants did move to stay service,

2    which was denied by the Court.

3          THE COURT:  Okay.  And so at this point where things

4    stand is that you had said at the outset of this call or near

5    the outset that you were seeking documents in the first

6    instance from these customers and that you may or may not need

7    depositions down the road.  Am I right about that?

8          MS. KALMANSON:  So they are both -- the subpoenas

9    seek both documents and depositions.  The form of the subpoena,

10   as your Honor knows, calls for the documents to be produced at

11   the deposition.  It is our intent, though we have not yet done

12   so, we were waiting for this call, to reach out to the

13   nonparties and explain to them that we would ask for the

14   documents first, we can adjourn the depositions, and we may not

15   need the depositions if the documents demonstrate what we need,

16   or provide the information we're looking for, is what I mean.

17         THE COURT:  Okay.  And so based on my -- and so

18   Mr. Moser, your primary complaint about the subpoenas is that

19   you think that they're burdensome, harassing, they are

20   intrusive.  Is there more -- do you argue that they're not

21   relevant or is it largely that you think you don't want to

22   hassle customers and have to be hauled in for depositions?

23         MR. MOSER:  I would like to rely on the -- I would

24   like a formal decision on the motion to quash.  It's been fully

25   briefed.

1          We -- here's the thing.  The plaintiffs -- the

2    plaintiff, has stated several times that the only people who

3    have discoverable information are eight current and former

4    employees.  And the idea that -- this is the reverse scenario

5    of when a defendant in an overtime case or in a discrimination

6    case attempts to subpoena a current employer of the plaintiff,

7    simply the hat is on the other side this time.  We made

8    extensive arguments in our motion that we'd like to rely on

9    them.  To the extent that this can be converted to a document

10   subpoena, I have no issue with that.

11          THE COURT:  Okay.  So the way I had been -- I'd like

12   to (indiscernible) a ruling on that so that the parties can

13   move forward and not wait for a formal written decision.  If

14   you want that, we can still issue one, but I want the parties

15   to be able to move forward.  In my view, what I was going to

16   have happen is the parties -- that the subpoenas at this point

17   be converted into document subpoenas, that you first seek the

18   documents and see if you can work out an arrangement so that

19   the documents are sufficient for your purposes, and then come

20   back if you think you need the deposition.

21          My hope is that -- to me, the right thing to do would

22   be to first see if you have any billing documents that satisfy

23   this request.  It seems potentially unnecessary to seek out

24   deposition testimony of these customers and potentially

25   burdensome, potentially intrusive.

1          So I think first step is get the documents and see if

2     that will resolve the issue short of needing a deposition.  And

3     in deposition, if you're unable to work out with these

4     nonparties and/or Mr. Moser the production of these documents

5     to satisfy your inquiry, then come back to the Court and we can

6     talk it out whether the depositions make sense.

7          MS. KALMANSON:  Your Honor, that's understandable and

8     understood.

9          I have a question about how you'd like to see that

10    proceed, right?  So let's just say in theory these customers

11    have invoices reflecting that they paid Rolling Lawns for work

12    on X, Y, Z dates over one, two, three periods, right?  But the

13    invoices aren't necessarily going to reflect who from Rolling

14    Lawns performs those services.  So we're going to have to

15    questions.  Right?

16         Now, Mr. Galvan was a 30-year employee.  Could be

17    that he had a week-to-week relationship with some of these

18    people, I don't know.  In the event that we get that kind of

19    information that opens the door to wanting additional

20    information in the form of a deposition, how would you like

21    that to be addressed to the Court, anticipating that we're not

22    going to be able to find common ground with Mr. Moser given the

23    history here?

24         THE COURT:  So you, at the moment, intend to contact

25    these individuals, right?  These nonparties, as far as you

1    know, don't have lawyers?

2              MS. KLETTER:  Your Honor.

3              MS. KALMANSON:  We know --

4              THE COURT:  Go ahead, Kim.

5              MS. KALMANSON:  One individual reached out to

6    Ms. Cohen, I believe, and indicated that he will be away on the

7    date of the deposition.  There were no -- and that he didn't

8    have any documents.  We haven't had any further conversations

9    with him.  So our intent was to reach out to them.  We don't

10   believe they are represented by counsel.  We have no reason to

11   believe they're represented by counsel at this point, but of

12   course if counsel comes in, we'll deal with counsel.  No one

13   has otherwise reached out to us.  It was our intent to reach

14   out and seek the documents first.

15             I guess the question I have for the Court is, are we

16   re-serving subpoenas or are we just sort of doing this the way

17   proposed, which is to say please produce the documents first --

18             THE COURT:  Yes.

19             MS. KALMANSON:  -- and then we'll adjourn the

20   deposition --

21             THE COURT:  The latter.  The latter.

22             MS. KALMANSON:  Okay.

23             THE COURT:  The latter.

24             MS. KALMANSON:  Okay.

25             THE COURT:  I don't intend for you to re-serve.  I'm

1    simply saying based on what you served -- what you can do with

2    these parties is say, we will adjourn the deposition requests

3    based on your production of documents instead, if you have any

4    that are responsive.  And then to the extent you have follow-up

5    questions -- first see what you get.  If you have follow-up

6    questions, you can ask them without a deposition to see if they

7    have answers.

8            And I think we can then address it when you have more

9    information to know what it is that they know and what you're

10   likely to get in terms of information from them.  It may be

11   that a deposition is the easiest and most efficient, I don't

12   know.  At this point, though, it doesn't sound like it to me

13   and I'd like you to first explore other options short of a

14   deposition.

15           Perhaps a written interrogatory.  Maybe they can

16   respond to questions, interrogatories, that are directed at

17   particular invoices based on conversations you've had so that

18   they become admissible as evidence in the case.

19           Then there are probably other alternatives short of

20   having four to six positions of nonparty customers.  So let's

21   explore them before we get there.

22           MS. KALMANSON:  Understood, your Honor.

23           THE COURT:  Okay.  So at this point I think we have

24   some deadlines that we set and I will see if -- you all took

25   good notes, hopefully.

1              But the middle of next week, August 21, I know

2       Mr. Moser was going to follow up with an answer on the ESI

3       questions and the parties are going to meet and confer.

4              I also believe the plaintiff is going to send a

5       letter that clarified or confirms whether or not they withheld

6       any documents based on their objection, and whether any

7       documents have been withheld on the basis of privilege, and the

8       timing for production of a privilege log.  I don't recall if I

9       set a deadline for that letter.

10             Do you have a view -- go ahead.

11             MS. KALMANSON:  You did not, your Honor.  The letter

12      is also to include a statement that Mr. Galvan did not apply

13      for workers' compensation, by my notes.

14             THE COURT:  Okay.  So then how long do you think

15      you'll want to be able to put that letter together and get over

16      to Mr. Moser?

17             MS. KALMANSON:  We can get that letter together by

18      Friday.

19             THE COURT:  Okay.  Great.

20             So let me see if there's anything else.  It would be

21      helpful to keep in close touch with all of you given all of the

22      moving parts and issues that seem to come up.

23             The issue of the deadline, you know, we can revisit

24      your fact discovery deadlines and the like.  It sounds like

25      both parties are in agreement that we should work through these

1    document issues and make sure that everything is squared away

2    before you start taking all the depositions.

3              Is everybody still in agreement about that?

4              MR. MOSER:  Yes, your Honor.

5              THE COURT:  Okay.  So I'd like the parties then to,

6    based on the ruling today, based on our discussion, talk

7    through what that looks like and propose sort of a new timeline

8    among yourselves for when you'd like to reschedule these

9    depositions in light of any other document that needs to be

10   produced.

11             And that would include, you know, thinking about

12   extension of deadline, realistically how much time do you think

13   you'll need to complete fact discovery and then expert

14   discovery after that.  So let's have a conversation about that.

15             Let's see, in the first week of September, are people

16   around?

17             MR. MOSER:  I am, unfortunately, your Honor.

18             THE COURT:  You are unfortunately?  Okay.

19             And on the plaintiff's side, is that a week -- are

20   you around that week?

21             MS. KALMANSON:  Yes, your Honor.

22             THE COURT:  Okay.  So why don't we check in by status

23   conference like this one on Thursday, September 5th, at 11:00

24   a.m.  Does that work for everyone?

25             MS. COHEN:  Your Honor, with the caveat that the case

                Angela O'Donnell - Official Court Reporter
                            (914)390-4025

1    is 99 percent settled, Kim Kalmanson and I are already

2    scheduled to be before Judge Cote at 11:00 a.m. that day.

3    We're settling that case, but it is not papered so...

4            THE COURT:  Okay.  Let's see, how about is Wednesday

5    September 4th better?  11:00 a.m.

6            Does that work for you all?

7            MS. COHEN:  Kim, Joni, is that okay for you?

8            MS. KALMANSON:  That's fine for me.

9            MS. KLETTER:  Yeah, yeah.

10           THE COURT:  Okay.  So why don't we say Wednesday,

11   September 4th at 11:00 a.m.  We'll enter a minute entry that

12   sets that date for a status conference.

13           So by then I'll hope to learn more from the parties

14   about how you've done with ESI and your discussions about that

15   and your proposal for how to move forward with the depositions

16   schedule and potential revising of deadlines in light of the

17   document discovery that needs to be done.

18           And of course if there are any issues that need to be

19   addressed before that date, the parties should follow my

20   individual practices.  So I know you have Judge Seibel's case

21   management plan with its way of how (indiscernible) to be

22   resolved.  But to be clear, this case has now been referred to

23   me for general pretrial supervision.  So my rules apply as to

24   how we're going to resolve discovery disputes going forward.

25           Under my rules, what I expect from the parties is

1    that you have to meaningfully meet and confer and reach an

2    impasse before you reach out to me by premotion letter, no

3    longer than three pages, explaining to me the nature of your

4    dispute and the steps you've taken to reach resolution.  The

5    other side gets an opportunity to respond within five business

6    days and then we're going to have a call like this one to hash

7    it out with the hope of resolving things short of full-blown

8    motion practice.

9            I don't have deadlines like the ones in Judge

10    Seibel's rules that say X number of days after you serve a

11    response or objection and you have X number of days to make

12    objections or meet and confer or to (indiscernible).  I don't

13    have anything like that.  So those rules don't apply here.

14            Does anyone have any questions about that?

15            MS. KALMANSON:  No, your Honor.

16            THE COURT:  Okay.  Let's see.

17            I think that's it for now.  I'll adjourn and wish you

18    all a good day.

19            MR. MOSER:  Your Honor.

20            THE COURT:  Yes, go ahead.  You have something more?

21            MS. KALMANSON:  Please tell me it's not another

22    dispute, Mr. Moser.

23            MR. MOSER:  No.  I just want to clarify --

24            MS. KALMANSON:  Okay.  Good.

25            MR. MOSER:  I just want to clarify that the motion to

```
 1   quash is being held in -- the formal motion to quash is
 2   basically being held in abeyance pending further information
 3   from the nonparties.
 4              THE COURT:  Held in abeyance.  I mean, I guess --
 5              MR. MOSER:  Otherwise, there is a motion that's fully
 6   submitted to the Court, you know, I understand --
 7              THE COURT:  I mean, I've ruled on the record today on
 8   that motion.  I guess the question is formally will you call
 9   it -- I think it is granted in part and denied in part, the way
10   I view it.  I think I'm granting your motion to the extent that
11   I'm not allowing depositions to move forward at this time.  I'm
12   denying your motion to the extent I'm allowing the documents
13   subpoena portion of it to move forward.  The question of
14   depositions can be revisited at a later time by the plaintiff,
15   but at the moment that request was denied.
16              MR. MOSER:  Okay.  Thank you.
17              THE COURT:  Okay.  Okay.  So with that I'll say
18   goodbye to all of you and look forward to hearing from you all
19   or talking to you all in early September, unless I hear from
20   you before then.
21              Thanks very much.
22              MR. MOSER:  Thank you.
23              MS. KALMANSON:  Thanks, your Honor.
24              THE COURT:  Thank you.
25                              o0o
```